294 So.2d 768

**Hosea WALKER**

v.

**STATE.**

**4 Div. 267.**

Court of Criminal Appeals of Alabama.

May 21, 1974.

———◆———

Smith & Smith, Dothan, for appellant.

William J. Baxley, Atty. Gen., and Donald G. Valeska, II, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Walker was convicted of murder in the first degree and sentenced to imprisonment in the pentitentiary for and during his natural life. Upon being arraigned with counsel present, he pleaded not guilty. After conviction he sought and obtained a free transcript of the evidence and trial counsel represents him on appeal.

There was no motion to exclude the state's evidence. There was no request for the affirmative charge. There was a motion for a new trial but it does not appear from the record that the sufficiency of the evidence was a ground thereof. More will be said about the motion for a new trial later in this opinion. In this posture of the case before us we do not deem it necessary to set out in detail the evidence adduced by the state.

It all started on the night of November 24, 1972, at a Negro night spot in a rural section of Henry County where beer was sold and where music was furnished by a rockola. A billiard table was in the place and a pool game was in progress. The witnesses saw appellant and the deceased in a corner of the place engaged in a conversation. The conversation was nor over-

heard by anyone present and when it terminated both were seen going out the front door.

According to the testimony of appellant, the conversation inside the building concerned deceased's attentions to appellant's wife wherein the deceased told appellant that he was —— his wife and if he wanted to know more about it to step outside and he would tell him. On the outside the deceased again told appellant that he was —— his wife and there was nothing he could do about it. He further told appellant that he would —— his wife right before his —— face. He also told appellant that he had been sleeping with his mother, too. Appellant said the deceased then spit in his face and said he would blow his brains out and put his hand in his pocket. Appellant then pulled his knife and cut the deceased on his neck and hand and the deceased walked back in the building followed by appellant. Appellant grabbed the deceased from behind and turned him around and there was a fight to the knife, and the knife to the hilt, and appellant's wife's erstwhile lover was on his way to glory; that is, assuming in the last agonizing moments of life there was still time for repentance and to seek forgiveness and receive salvation. Biblical history teaches that this does not take long. From this tragedy there springs a moral of some sorts: It is extremely dangerous for a rounder and a libertine to kiss and brag about it.

There is a fair inference from the record before us that a love affair existed between the deceased and appellant's wife. Appellant testified that he had known about the affair for a year and that he was not mad with the deceased as he felt it was more his wife's fault as she had been chasing after the deceased. He further testified that he found love letters from his wife to the deceased and he had given them to her; that he told his wife if she wanted the deceased more than she did him to go ahead and make her choice. Appellant's wife did not reply to this and neither did she make a choice. Apparently she was satisfied to let things continue as they had been in the past.

Since appellant had knowledge of the love affair in existence, certainly his mind was not dethroned and passion held sway by what the deceased told him that night. he testified that two weeks before the killing, the deceased told three or four men in his presence what he was doing to appellant's wife and appellant did not say anything.

Appellant's wife rode in the automobile with the deceased to the hospital in Ft. Gaines, Georgia. He died before reaching the hospital. At trial appellant called his wife as a witness. She was advised of her right not to testify and she made it plain that she did not want to testify.

Appellant claimed self-defense. He said that when the deceased told him he was going to blow his brains out he saw the handle of a pistol sticking out of the deceased's right pocket and saw him reaching for the gun. All witnesses for the state testified they did not see a weapon of any kind in the hands of the deceased and no pistol was found at the scene of the homicide nor in the pockets or clothing worn by him that night. It is reasonable to conclude that appellant got mad when the deceased taunted him about his wife which, if true, was a mighty indiscreet thing to have done.

At the hearing on the motion for a new trial, appellant contended that he was deprived of his right to a trial by a jury of twelve men for the reason the jury was composed of eight white men and four Negroes. He made the claim that the white jurors told the Negro jurors that inasmuch as all parties involved, including the witnesses, were blacks they would go along with any verdict the four Negro jurors agreed upon. Appellant's counsel was candid with the court and frankly said he had no proof that this actually occurred. The record affirmatively shows that when the verdict was read, the jury was polled and

they all replied that it was the verdict of each juror.

The only other matter urged for a reversal was the action of the court in allowing the prosecution to ask leading questions. We have carefully studied the record and note there were a number of leading questions posed by the prosecutors but in every instance where there was a pure leading question, the court sustained appellant's objection and where a motion to exclude was made, the court promptly granted the motion and instructed the jury to disregard the answers.

The rule in regard to leading questions is best stated by Mr. Justice Stone in Blunt v. Strong, 60 Ala. 572, as follows:

"To determine when a question is leading, and, if leading, when it will be allowed in practice, is one of the most difficult questions the practitioner encounters. So much depends on the nature of the fact sought to be proved, and on the temper and bias of the witness, that no general rule can be laid down, which will suit the requirements of every case. All the authorities agree, that direct and leading questions may be propounded to any witness, to lead his mind and attention up to any subject, upon which he is called to testify; and there are many other questions, which are of such character, that the inquiry must be framed in leading form, else the counsel and witness can not be made to understand each other. Proof of handwriting, of character, of personal identity, and of many other analogous subjects, are of this class. And when a witness is called to testify against what appears to be his interest or bias, or manifests reluctance, hesitation, evasion, or art, in giving his testimony, the court will permit leading questions to be propounded by the party calling him, so as to elicit the full truth, if possible. These rules, if they may be called rules, are so much dependent on the circumstances of the particular case, that they can rarely become the subject of judicial review."

Judge McElroy in his Law of Evidence In Alabama, Vol. 1, page 285, Section 121.-05, said:

"The trial court has a vast discretion in the allowance or disallowance of leading questions—so vast that it has been said that the most flagrant violation of the guides to the trial court's discretion is not revisable by an appellate court. Anderson v. State, 104 Ala. 83, 16 So. 108."

Nevertheless, our search of the record does not reveal the trial court erred in the admission of the evidence in this trial, and the case is due to be affirmed.

Affirmed.

All the Judges concur.